UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

NAVA BETTINGER and DANIEL           :
BETTINGER, collectively and individually
on behalf of ELAN BETTINGER, a minor, :

                                                            :
                Plaintiffs,                      06 CV 6889 (PAC)
                                                            :

                -against-                      :
                                                            OPINION & ORDER
NEW YORK CITY BOARD OF              :
EDUCATION, d.b.a. NEW YORK CITY
DEPARTMENT OF EDUCATION, and        :
JOEL KLEIN, Chancellor of the New York
City Schools,                       :

                                                            :
                Defendants.
                                                             :
------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs Nava and Daniel Bettinger ("the parents"), on behalf of their son Elan, (collectively "Plaintiffs" or "Bettingers") and Defendants New York City Board of Education, doing business as New York City Department of Education, and Joel Klein, Chancellor of New York City Schools, (collectively "Defendants" or "the City") cross-move for summary judgment on an administrative decision providing partial private school tuition reimbursement to the Plaintiffs under the Individuals with Disabilities Education Act ("IDEA"). For the reasons discussed below, Plaintiffs' motion is denied and Defendants' motion is granted.

**SUMMARY OF FACTS**[1]

At the time of the events at issue in this lawsuit, Elan Bettinger was a five-year-old emotionally disturbed student who exhibited aggressive tendencies and had been diagnosed with a number of personality and learning disorders.[2] Despite Elan's emotional and developmental disabilities, testing revealed that he had a performance Intelligence Quotient ("IQ") of 140 and a verbal IQ of 101, yielding a full scale IQ of 122, placing him in the "superior range" of cognitive abilities.[3] Def. Ex. F at 3-1. Due to Elan's special needs and his difficulties in his pre-school class, Elan's parents anticipated that he might require special attention in kindergarten, attention that might not be possible in a regular public school. Hr. Tr. at 92. Indeed, Elan was already in danger of being expelled from his pre-school class mid-year due to his behavior. See id. at 98, 102. As such, in January 2005, Elan's parents applied for him to attend the West End Day School (hereinafter "West End"), a private school on the Upper West Side of Manhattan. See id.

The timing of the Bettingers' application to West End in January 2005 was designed so that Elan would have an appropriate placement for kindergarten in the fall, but also so that if he were expelled from his regular pre-school program, he could

---

[1] On these cross-motions for summary judgment, all facts are derived from the parties' Rule 56.1 statements, their motions and the exhibits attached thereto, abbreviated, respectively, as "Pl. Ex." and "Def. Ex." Also, both parties have submitted a transcript of the hearing held before the impartial hearing officer on Oct. 28, 2005 and Dec. 7, 2005. This transcript is separately abbreviated as "Hr. Tr." Finally, the transcript of the oral argument held before this court on Oct. 11, 2007, is abbreviated as "Arg. Tr."

[2] In his pre-school program, Elan had been known to hit, kick, and bite other students, and to behave aggressively toward teachers. See Pl. Ex. E at 1. His diagnoses include: Oppositional Defiant Disorder, Mixed Receptive-Expressive Language Disorder, Attention Deficit Hyperactivity Disorder, and Developmental Coordination Disorder. Pl. Ex. G at 4-1.

[3] Despite the "superior" results of the IQ testing, his kindergarten teacher testified that he demonstrated only "average" cognitive abilities in the classroom environment. Hr. Tr. at 79, 86.

continue his 2004-2005 pre-school school year there. See id. Indeed, the Director of Admissions at West End testified that:

> [W]e [at West End] never were sure whether we were going to admit him at the middle of [his pre-school] year or not because it wasn't clear whether [Elan] was going to be asked to leave his other school. But we did accept him for [the regular academic year program starting in] September.

Id. at 102.

She further explained that administrators at his pre-school school "were going to ask him to leave in mid-year. And they only reconsidered because . . . the family had a shadow for him." Id. at 98. The presence of the "shadow,"[4] and limiting his attendance to a half-day (as opposed to a full day) of school allowed him to stay at his regular pre-school program for the remainder of the 2004-2005 school year. Ultimately, therefore, his parents only sought admission to West End commencing in July, 2005, after his pre-school year ended. Id.

In February, 2005, Elan was formally accepted at West End for both the "Summer Learning Program," a six-week program which ran from July 1, 2005, until August 11, 2005, and the academic year program, which began in September and ran during the course of the traditional school year. Id. at 94-95. While the two programs are separate, for students with special needs, the fall placement is contingent on successful completion of the summer program.[5]

After securing Elan's admission to West End on February 14, 2005, Elan's parents paid the school two deposits on two separate dates to secure his place in both the

---

[4] A "shadow" is an adult who continually monitored Elan's behavior at his pre-school program.
[5] See Hr. Tr. at 104-05 ("[O]n children that are coming to us with significant behavior problems in their previous school, we do talk to the parents about the possibility that we may not be able to keep a child after we see him for the summer . . . . If we felt that he was tearing the place apart in the summer, we would have returned their check and not accepted him for September.").

3

2005 summer program and the 2005-2006 regular academic year term, respectively.[6] Tuition for the 2005 Summer Learning Program was $10,500 and tuition for the 2005-2006 academic year was $30,500.00.[7] In March, 2005, after Elan had already been admitted to both the summer program and the regular school year term at West End, and deposits made, a psychiatrist found that the structure of year-round school attendance would benefit Elan, and recommended that he attend a 12-month program. Pl. Ex. E at 3.

In Spring, 2005, Elan's parents requested that the Department of Education's Committee on Special Education ("CSE") develop a suitable educational plan for Elan pursuant to IDEA and New York law. Elan's parents cooperated with the CSE and an "Individualized Education Program" ("IEP") designed for him was issued on June 9, 2005. The IEP called for Elan to be placed in a 12-month, small-group, non-public school program, but did not specifically recommend a non-public school for Elan to attend.[8] Pursuant to their placement procedure, the CSE contacted the Central Base Support Team ("CBST") which then sought an appropriate non-public school for Elan which would be paid for entirely by public funds. On July 1, 2005, three weeks after the IEP was developed, but before the CBST had contacted them regarding a non-public school placement, Elan began his summer program at the West End Day School.

During the summer months, Elan's parents were contacted by at least two CBST-referred non-public schools.[9] Arg. Tr. at 5. One of those schools was the Lorge School,

---

[6] See Pl. Ex. D at 1-2, checks from Mr. Daniel Bettinger to the West End Day School for: (1) the amount of $1000.00 dated Feb. 20, 2005 (for the summer program), and (2) the amount of $10,500 dated Feb. 23, 2005 (a non-refundable deposit for the regular school year).
[7] Hr. Tr. at 83, 100; see also Letter from West End Day School, Feb. 14, 2005, submitted by Plaintiffs to the Court on Oct. 16, 2007.
[8] An IEP recommending placement in a non-public school is not "finalized" until a specific school for the child has been identified.
[9] The CBST sent Elan's file to approximately twelve state-approved, non-public schools. Arg. Tr. at 3. According to Plaintiffs' letter of Aug. 15, 2005, at least two of these schools contacted the Bettingers

located in the Chelsea section of Manhattan. The Lorge School invited Elan and his parents to visit and interview at the school to determine if Lorge was an appropriate placement given his special needs. Arg. Tr. at 5, Hr. Tr. at 71. Elan's parents refused to interview at the school, and claimed that taking Elan out of his West End summer school would traumatize him.[10] Since there was no interview, Elan could not be admitted to the Lorge School, and, in accordance with school policy, Lorge School administrators sent a letter to the CBST informing them that the Bettingers were not interested in placing Elan at their school.[11]

Since the parents chose not to pursue the CBST's non-public school options, no publicly-funded, special-needs schools were selected to meet the requirements of his IEP. By the fall of 2005, Elan had two options: a regular public school kindergarten, which the IEP recognized as inappropriate, and the West End Day School, which his parents had selected for him in January 2005. The parents placed him in the West End Day School's program and sought reimbursement pursuant to IDEA for the cost of this private school tuition.

In accordance with IDEA requirements, the parents requested a hearing before an impartial hearing officer to adjudicate their request for reimbursement of the cost of both

---

between July 1 and August 15, 2005. See Pl. Ex. A. One of those schools was the Lorge School, and the details of that contact are discussed at length here. Neither the identity of the other school, nor any details regarding what transpired between that school's administrators and the Bettingers, is contained in the record.

[10] Elan's parents contend that a Lorge school administrator advised them that they could not visit the school without Elan since Elan's presence at the school was a prerequisite to his admission. See Hr. Tr. 41-42, 74. Elan's parents further claim that they told the administrator they did not wish to pull Elan out of his regular day school program without first assessing whether the Lorge School was an appropriate placement for him. In contrast, the Lorge School administrator, Ms. Whiteman, testified that she invited the Bettingers for an interview, but advised them that it was not very efficient to come without Elan because they would eventually have to return with the child. Id. at 74. According to Ms. Whiteman, Ms. Bettinger responded by saying that "she had other interviews and she was not interested in interviewing at [the Lorge School] then." Id. at 71. The impartial hearing officer, who heard the testimony and observed the witnesses first-hand, credited Ms. Whiteman's testimony. Pl. Ex. B at 8-9.

[11] Hr. Tr. at 74-75.

5

West End's summer program and the regular academic year program. This request was made by letter dated August 15, 2005, four days after the summer school program ended and three weeks before the start of the 2005-2006 academic school year.[12] The hearing, which took place on October 28 and December 7, 2005, resulted in a denial of tuition reimbursement for the parents. The hearing officer found that:

> [I]t [was] clear from the evidence that, as early as January 2005, it was the parents' intention to enroll the child in the West End Day School, and it appeared that the parents had no interest in exploring the options offered by [the Department of Education]. I conclude that the parents did not cooperate with [the Department of Education] and that their claim is not supported by equitable considerations . . . . The parents' request for tuition reimbursement is denied.[13]

Pl. Ex. B at 9.

The parents appealed this determination to the Office of State Review. On appeal, the State Review Officer (hereinafter "SRO") agreed that Elan had special needs, but denied the request for full tuition reimbursement despite the parents' contention that Elan was unable to receive a free appropriate public education ("FAPE") as required by the IDEA.

The SRO noted that Elan's June 9 IEP did not indicate a specific school placement, as required for finalization. Instead, his case was referred to the CBST, which is charged with locating an appropriate non-public school. SRO at 6. Since no

---

[12] In 2005, the first day of New York City public schools was Thursday, Sep. 8, 2005. See the 2005-2006 academic year calendar available at http://schools.nyc.gov. The Lorge School was considered and rejected by Elan's parents prior to August 11, 2005. The Court notes that there were four weeks between the end of the West End summer program on August 11 and the start of school on September 8 when further inquiries into City-referred, non-public schools could have been made. But the record reveals that no such effort to inquire about other options was made by the Bettingers.

[13] The impartial hearing officer also found that the alternative offered by the Department of Education, the Lorge School, was an appropriate placement for Elan. Pl. Ex. B at 8. Such a finding is relevant to the first factor of the reimbursement test articulated in Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 367-70 (1985). See infra Part II.B. Since that factor (adequacy of services offered by the City) is conceded here, the critical part of the decision for our purposes is the hearing officer's findings regarding the parents' cooperation and the equitable considerations as they relate to the third prong of Burlington.

placement was ultimately found, and the IEP never finalized, the SRO found that the child was not offered a FAPE "because, although the June 9, 2005 IEP recommended a 12-month school year, the child was not offered an educational placement prior to the July 1, 2005 beginning of the West End summer program." Id. Moreover, the SRO found that West End was an appropriate placement for Elan because it offered "a small, highly structured, therapeutic special education," with "significant individualized attention," and "speech therapy, occupational therapy, and counseling." Id. at 7.

That does not end the matter, however. The SRO went on to find that even though the New York City Department of Education failed to provide Elan with the requisite FAPE, the equities did not favor full tuition reimbursement because Elan's parents failed to cooperate with the City's efforts to place Elan and instead unilaterally chose to place him elsewhere. The review officer, in agreement with the impartial hearing officer, held that:

> A parent's failure to make their child available for an intake evaluation interview at the district's recommended placement option is relevant in determining whether equitable considerations support their claim for reimbursement. Where a parent deprives the district of its ability to make an appropriate program recommendation and obstructs the district's ability to finalize the student's IEP, equitable considerations will not support an award of tuition reimbursement.

Id. at 8. The officer further explained that "[e]quitable principles dictate that parents cannot deliberately withhold their child from an intake interview and impede a district's ability to offer a FAPE and also secure a future award of tuition reimbursement at a private school of their choosing." Id. The SRO did, however, authorize partial tuition reimbursement for the West End Day School summer program, since Elan's IEP recommended a 12-month program and the City failed to provide an appropriate 12-

month placement by July 1, 2005.[14] The parents now appeal to this court claiming that denial of tuition reimbursement for the regular academic school year constitutes a violation of both IDEA and New York State law.

## DISCUSSION

**I. Applicable Standard**

A parent dissatisfied with a state review officer's decision to deny tuition reimbursement may bring a civil action in federal district court. 20 U.S.C. § 1415(i)(2)(A). The reviewing court:

> (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(B).[15]

While an IDEA appeal is in the form of a summary judgment motion, the existence of a genuine issue of material fact will not result in a denial. J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Instead, the federal court reviewing an administrative decision under IDEA bases its decision on an independent review of the record using a "preponderance of the evidence" standard. Bd. of Ed. v. Rowley, 458 U.S. 176, 205 (1982). In reviewing an IDEA action, the Second Circuit has held that "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings,

---

[14] Thus, the SRO awarded the Bettingers reimbursement for West End's Summer Learning Program only. As previously stated, the cost of that program was $10,500. The Defendants do not appeal from this award and the Court accepts that the Bettingers are entitled to partial reimbursement because the City failed to provide a summer program for Elan to attend, and therefore failed to fulfill their own recommendation that he attend a 12-month program.

[15] At the oral argument of these cross-motions on Oct. 11, 2007, the Court inquired as to whether either party wanted to offer additional evidence or conduct another hearing before this Court. Both parties said they would rest on the record as developed by the administrative proceedings below. Arg. Tr. at 22, 29.

mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Sherman v. Mamoroneck Union Free Sch. Dist., 340 F.3d 87, 93 (2d Cir. 2003) (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998)). A district court must conduct an independent review of the record and exercise its own judgment in deciding whether to grant tuition reimbursement, but it also must give due deference to the decisions of the experts below.

**II. Education Law**

    **A. The IDEA and FAPE**

The New York City Department of Education is responsible for providing a FAPE to New York City resident students with disabilities who are in need of special education programs. 20 U.S.C. §§1400-1487; N.Y. Educ. Law §§4401-4410-a (McKinney's 2005).[16] A FAPE includes "'special education and related services' tailored to meet the unique needs of a particular child, and [must] be 'reasonably calculated to enable the child to receive educational benefits.'" Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006) (quoting Walczak, 142 F.3d at 122); see also 20 U.S.C. § 1401(8). In relation to these requirements, when a child is identified as having special needs, the City's Department of Education and the child's parents work together to develop an IEP which defines the child's educational needs and delineates how those needs will be met and a FAPE provided. A denial of a FAPE occurs when procedural inadequacies result in a loss of educational opportunity for the student or seriously infringe on the parents' opportunity to participate in the IEP formulation process, or when

---

[16] New York State participates in the IDEA statutory scheme through Article 89 of the New York State Education Law.

9

procedural inadequacies compromise the development of an appropriate IEP in a way that deprives the student of educational benefits under that plan. Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005); see also SRO at 5. Part of the City's responsibility in ensuring a FAPE to all eligible students includes providing tuition reimbursement when the City's public schools are unable to provide the FAPE, or the City is unable to place the child in an appropriate non-public school, and a child must go elsewhere to receive the education to which he or she is entitled by law.

### B. Tuition Reimbursement and Burlington's Three-Prong Test

If the state fails to provide a FAPE for the child, the parent may remove the child from public school, place him in an appropriate private school program, and seek retroactive tuition reimbursement. See 20 U.S.C. § 1412 (a)(10)(C); Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 367-70 (1985); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993). The Supreme Court, in evaluating a request for tuition reimbursement, explained that tuition reimbursement for private schooling is not the normal remedy that Congress intended in a typical IDEA case. Carter, 510 U.S. at 12. Instead, "Congress intended that IDEA's promise of a 'free appropriate public education' for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents." Id. Thus, the remedy of tuition reimbursement is not the remedy of first choice; it is available in unusual or extraordinary circumstances.

Since the right to tuition reimbursement is not available in ordinary circumstances, the Supreme Court has fashioned a multi-part inquiry, the so-called "Burlington test," which a reviewing court must conduct to determine whether tuition

reimbursement is appropriate. Burlington, 471 U.S. at 367-70. This test has alternately been characterized as a two-part test, with an added evaluation of equitable considerations,[17] or a three-part test, with an evaluation of equitable considerations as an enumerated factor;[18] either way, "[i]t is well established that equitable considerations are relevant in fashioning relief under the IDEA."[19] M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 (2d Cir. 2000) (citations omitted). Regardless of the formulation of the test, the same questions must be asked: (1) whether the services offered by the board of education were inadequate or inappropriate, (2) whether the services selected by the parents were appropriate, and (3) whether equitable

---

[17] See Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363-64 (2d Cir. 2006) ("In determining whether parents are entitled to reimbursement, the Supreme Court has established a two pronged test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs. Moreover, because the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'") (citations omitted).

[18] See, e.g., Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 418 (S.D.N.Y. 2007) ("[When] dealing with the question of reimbursement for a unilateral parental placement, the rules are clear. A Board of Education may be required to pay for educational services . . . if and only if, three conditions are met: (i) the services offered by the board of education were inadequate or inappropriate, (ii) the services selected by the parent were appropriate, and (iii) equitable considerations support the parents' claim."); Perricelli v. Carmel Cent. Sch. Dist., No. 06 Civ. 2114 (CM), 2007 WL 465211, at *2 (S.D.N.Y. Feb. 9, 2007) ("[I]n order to determine whether the Plaintiffs are entitled to summary judgment on the issue of reimbursement . . . the court must address the three Burlington factors."); Sinan L. v. Sch. Dist. of Phila., No. 06-1342 (MMB), 2007 WL 1933021, at *5 (E.D.Pa., July, 2, 2007) ("Under the Supreme Court's precedents in Burlington and Carter, a three-step analysis should be applied to determine whether to order tuition reimbursement.").

[19] See, e.g., L.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 979 n.18 (10th Cir. 2004) ("The Supreme Court held, in [Burlington] and in [Carter] that equitable considerations can limit the amount of recovery."); Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 771 (6th Cir. 2001) ("[W]e are mindful of the Court's mandate in Burlington that equitable considerations are relevant in fashioning relief under [the IDEA]. . . . [I]t is the district court's role in the first instance to weigh the equities in this case to determine the appropriate level of reimbursement to be awarded."); Bd. of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Kelly E., 207 F.3d 931, 937-38 (7th Cir. 2000) ("[O]nce a court holds that the public placement violated IDEA, it is authorized to 'grant such relief as the court determines is appropriate.' Under this provision, 'equitable considerations are relevant in fashioning relief,' and the court enjoys 'broad discretion' in so doing.") (citations omitted); Sellers by Sellers v. Sch. Bd. of City of Manassas, 141 F.3d 524, 527 (4th Cir. 1998) ("The purpose of [IDEA's] procedural mechanisms is to preserve the right to a free appropriate public education, not to provide a forum for tort-like claims of educational malpractice. Accordingly, the Supreme Court has noted that 'equitable considerations are relevant in fashioning relief.'") (citations omitted).

considerations support the parents' claim for reimbursement.  Burlington, 471 U.S. at 367-70.

In the instant case, the inadequacy of services offered by the Board of Education, the first prong of Burlington, is not challenged by the parties.  According to the SRO, Elan's IEP required placement in a non-public school, and when no such placement was identified or finalized by the City's staff, the services offered by the Board of Education were inadequate under the first prong.  SRO at 6.  But it is also clear from the record that the alternative school at which the Bettingers refused to interview was found to be an appropriate placement by the impartial hearing officer.  Pl. Ex. B at 8.[20]  As such, had the Bettingers visited the school, and had Elan been admitted there and his IEP finalized, the services provided by the Board of Education might very well have been adequate under Burlington's first factor.  Under such circumstances, the City would have provided a FAPE and no tuition reimbursement would be awarded.  The Bettingers' actions, however, preclude the Court from knowing whether or not the City might have offered adequate services, therefore, Burlington's first factor remains unchallenged.

Nor do the parties challenge the appropriateness of services selected by the parents under the second prong of Burlington.  Arg. Tr. at 27.  According to the SRO, West End was an appropriate placement in light of its small-group structure, individualized attention, and special classes.  SRO at 7. Thus, this case presents the narrow question of whether the parents are barred from receiving full tuition reimbursement because, under the third Burlington factor, equitable considerations do not support their claim.

---

[20] The impartial hearing officer concluded that "the child would have been suitably grouped at the Lorge School with students having similar abilities and needs . . . . Based on the evidence before me, I find that the services offered by [the Department of Education] were appropriate." Id.

12

When engaging in a review of equitable considerations under the third prong of Burlington, "the court enjoys 'broad discretion.'" Carter, 510 U.S. at 16 (quoting Burlington, 471 U.S. at 369). In addition to a thorough review of the administrative record, the Court "must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." Id. Certainly a major consideration in deciding whether the third factor is satisfied is whether the parents have cooperated with the City throughout the process to ensure their child receive a FAPE. If courts cannot read a parent's failure to cooperate with the City's efforts to place a child as "equitably disentitl[ing] them to tuition reimbursement, then the third prong of the Burlington test is essentially meaningless." Carmel Cent. Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 418 (S.D.N.Y. 2005).[21]

Moreover, what Congress guarantees to parents is a free <u>appropriate</u> public education, not a free <u>optimal</u> public education, nor a private education of their own choosing. As other courts have noted, "[w]hile the mother . . . may want the 'best' for her handicapped child, that is not what the law provides." M.S. and D.S. v. Mullica Twp. Bd. of Educ., 485 F. Supp. 2d 555, 565 (D.N.J. 2007) (citing Rowley, 458 U.S. at 203-04). The Supreme Court has rejected the argument that Congress intended the IDEA to mandate the "achievement of maximum potential" for each student. Instead, the IDEA is satisfied when the state provides an education at public expense, which meets the state's

---

[21] In Carmel, the Court rejected a claim of tuition reimbursement when the parents "never had the slightest intention of allowing the child to be educated in the public school [and] did everything possible to frustrate a timely review of [the child's] condition" before enrolling the child at private school. Carmel, 373 F. Supp. 2d at 416.

13

educational standards, approximates the grade levels used in public schools, and comports with the student's IEP. Rowley, 458 U.S. at 203.[22] Nothing more is required.

> [P]ublic educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, <u>or place the child in an appropriate private setting of the State's choice</u>. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

Carter, 510 U.S. at 15 (emphasis added). It is clear that "[w]hile the IDEA does not require states to maximize the potential of handicapped children, . . . it must provide such children with meaningful access to education." Frank G., 459 F.3d at 364 (citations omitted).

Parents, of course, can pursue whatever educational choices are best for their child; that is not in dispute here. The issue is under what circumstances parents may receive public reimbursement for an educational choice which they made. It is clear that parents seeking reimbursement must comply with the law throughout the entire process and not merely to the point where they think they have achieved what they want. Where parents unilaterally place their child in a private school and then frustrate the public educational authorities' ability to "place the child in an appropriate private setting of the State's choice," thus making it impossible to conform to IDEA's mandate, equitable considerations demand that the court deny reimbursement.

## III. Analysis

In this case, the Court must determine what degree of cooperation between parents and school officials satisfies Burlington's third factor. Here, the parents contacted the CSE to notify them of their child's special needs. They worked

---

[22] In the footnote associated with this passage, the Supreme Court goes further: "[m]oreover, even were we to agree that [Congress'] statements evince a congressional intent to maximize each child's potential, we could not hold that Congress had successfully imposed that burden upon the States." Id. at 204, n.26.

14

cooperatively with the CSE to formulate an IEP delineating the child's specific educational requirements. When the matter was referred to the CBST to explore an appropriate placement, however, the parents' cooperation ceased. In these circumstances, the Court finds that the Plaintiffs failed to satisfy the third factor of Burlington and accordingly, they are not entitled to tuition reimbursement.

**A. The Parents' Actions**

The record establishes that the Bettingers made plans to send Elan to West End as early as January 2005, and had no plans to entertain the non-public school options the City presented. In addition to making early application to West End and submitting large, non-refundable deposits, Ms. Bettinger visited the school no less than three times prior to Elan's admission, and she brought Elan to the school at least twice even though he was actively enrolled in another program.[23] The Bettingers interviewed at West End, and made Elan available for interview. The Bettingers were in frequent contact with West End about Elan's condition and his status at his regular pre-school program. In fact, based on the record it seems that Elan likely would have started at West End—even before his IEP was developed—in early 2005, had he been dismissed from his other pre-school program.

Between February and June, 2005, after Elan had been admitted to West End, the Bettingers contacted the CSE concerning Elan's status. The need to develop an IEP was recognized, and the IEP was formulated on June 9, 2005. With regard to the formulation

---

[23] The hearing transcript reveals that Ms. Bettinger made at least three visits to West End to determine if it was an appropriate placement for Elan. Ms. Bettinger testified, "first of all, I went in; I went in for an interview. I was given the information of what the school is like and, you know, [the West End administrator] looked at his IEP to determine if that school would fit Elan than [sic] we had Elan come in and we had Elan sit in on a classroom. And then there was a third appointment where the psychologist of the school assessed Elan." Hr. Tr. at 48.

of the IEP, it seems that the Bettingers wholly cooperated. It was in their interest to do so. Once the IEP was developed, however, at least two non-public schools, Lorge and another unidentified school,[24] contacted the Bettingers about placing Elan, but Ms. Bettinger simply did not engage with them. When placement became an issue, the Bettingers no longer cooperated as they had prior to the formulation of the IEP. It was no longer in their interest to do so.

A Lorge School administrator testified that when she contacted the Bettingers about an interview sometime in July 2005, Ms. Bettinger indicated that they had other interviews scheduled and were not interested in pursuing Lorge. Hr. Tr. at 71. Ms. Bettinger, in contrast, testified that she was told she could not come to Lorge without Elan, and that she had concerns about disrupting Elan's daily routine in order to visit a school that might not be an appropriate placement. This concern was not present, however, when Ms. Bettinger had Elan interviewed on several occasions at West End early in 2005. Id. at 48.

This Court finds that the determination made by the impartial hearing officer that the Lorge School administrator's testimony is more credible—a determination that was affirmed by the state review officer—is supported by a preponderance of the evidence. While Ms. Bettinger might have been discouraged from visiting Lorge without Elan since his presence would be required before any ultimate offer of admission could be made, the Court cannot accept that the school wholly precluded Ms. Bettinger from visiting without her son. Such a policy would serve neither the parents nor the school because both have an interest in exploring the fit between the school and the child to determine if placement is appropriate. Furthermore, there is nothing in the record to indicate that a visit to Lorge

---

[24] See discussion supra note 9.

could not have been made in the weeks after the West End summer program ended but before the regular school year had begun.[25] Despite the fact that Ms. Bettinger would undoubtedly have been allowed to visit Lorge, she expressed no interest in doing so.

Having secured Elan's admission to West End, the Bettingers' failure to cooperate with the City's attempts to place Elan continued throughout the summer. Indeed, the Bettingers began to seek reimbursement for their West End tuition payments on August 15, 2005, four days after the West End summer program ended, but three weeks before the regular 2005-2006 school year began on September 8, 2005. Pl. Ex. A. By this time, the Bettingers had at least two schools referred to them by the CBST: they never visited Lorge, and there is no record of their contact with the other school. There is also no record of the Bettingers returning to the CSE to review their status in the placement process, or to express their dissatisfaction with the referrals received. The Court agrees with the IHO and the SRO that the Bettingers had already made up their mind that Elan would attend West End for the entire year.

**B. The 12-Month Program**

In support of their request for tuition reimbursement, the Bettingers also argue that because the IEP recommended a 12-month program for Elan, and the City failed to provide such a placement by July 1, 2005, when Elan started at West End's Summer Learning Program, the Bettingers are entitled to full tuition reimbursement for Elan's entire year at West End.[26] Arg. Tr. at 4-5, 13; Burlington, 471 U.S. at 367-70. This argument is not persuasive.

---

[25] Or, alternatively, in the afternoons following the summer school day program.
[26] With respect to this argument, the Bettingers rely on 20 U.S.C. § 1414, requiring that the Department of Education have a valid IEP in effect "at the beginning of each school year." 20 U.S.C. § 1414(d)(2). The Bettingers assert that since Elan's IEP recommended a 12-month, non-public school placement, and no

17

The IEP's 12-month recommendation does not require that Elan be enrolled in a single program for an entire year, but rather, that he attend a structured program for a full 12 months. Nor does the IEP's 12-month recommendation mean that the parents' obligation to participate in the City's placement process ended on July 1, 2005. Indeed, even the West End Day School's program—which the Bettingers deemed appropriate for Elan within the meaning of his IEP—is not a single, continuous 12-month program. West End's 6-week summer program took place from July 1 to August 11. The school-year program, beginning a month later in September, was separate. Each program requires separate applications, deposits, and tuition payments. The separateness of the two was confirmed by the testimony of the West End school administrator. Elan's admission to the September class was contingent upon his successful adjustment to the summer program. If he did not adjust, he would not be admitted and his tuition deposit returned. Hr. Tr. 104-05.

Thus, the Bettingers' argument that the IEP required a single 12-month program, and when that program was not provided by July 1 their obligations ended, is unavailing. The regular school year did not begin for another ten weeks after July 1. The Bettingers' obligation to cooperate with public entities in locating a placement for their child during this period was not less than their obligation to participate in the preparation of the IEP. Had the Bettingers cooperated with the City's attempts to place Elan throughout July and August, they might have found the Lorge School, or another city-funded non-public

---

specific appropriate recommendation had been finalized by July 1, the Department had, by definition, failed to have a valid IEP in place "at the beginning of the school year." We reject that argument. The Department had failed to provide services in July and August as required by the IEP, but the Department still had time to find an appropriate placement for Elan for "the beginning of the school year" in September.

school, to be an appropriate placement.[27]  Alternatively, they might have established a reasoned basis for arguing that the placement was inappropriate.  Here, the Bettingers' refusal to entertain the City options precludes the Court from knowing whether another appropriate placement would have been found.[28]

In the circumstances of this case, the parents' lack of cooperation after July 1 and their refusal to visit a state-approved, non-public school frustrated the placement process.  IDEA does not allow parents to unilaterally select a school of preference for their child, enroll him, and then frustrate the City's placement system in order to gain tuition reimbursement for their school of choice from the courts.

In accordance with the standards set forth by IDEA and the Supreme Court, the Court has conducted a thorough review of the record in this case.  In addition to examining the transcripts and exhibits in detail, the Court has also given due deference to the administrative findings and expertise of the IHO and SRO below, and paid careful attention to credibility assessments based on first-hand observance of the witnesses.  In light of its review, the Court exercises its "broad discretion"[29] with regard to equitable remedies and reaches an independent judgment that the Plaintiffs failed to demonstrate

---

[27] Plaintiffs argue that the Lorge School "admitted that it was not appropriate" for Elan given his high IQ. See Hr. Tr. at 26.  It is clear from the record, however, that the Lorge School administrator stated that the school was not appropriate based on Elan's performance IQ of 140, not on his full-scale IQ of 122.

> Hearing Officer: "Had you known what his IQ was, would you still have invited the parent to come in?"
> Lorge School Administrator: "Probably not, no, I mean, if we're talking 140, no."

Id. at 28.  Nevertheless, when informed that Elan's full-scale IQ was 122, and asked the same question again, the administrator responded, "I might have depending on what the other issues are.  We do work with some children who are quite bright."  Id. at 29.

[28] It is true that the public educational authorities may not have been able to place Elan in an appropriate private setting, but we need not consider that hypothetical.  The parents' actions precluded them from trying, and under those circumstances, full reimbursement is not warranted.

[29] Carter, 510 U.S. at 16 (quoting Burlington, 471 U.S. at 369).

that they have complied with the third <u>Burlington</u> factor. Equitable considerations do not support their claim and they are not entitled to tuition reimbursement for the 2005-2006 academic year.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED and Plaintiffs' is DENIED. The Clerk of the Court is directed to close out this case.

Dated: New York, New York
November 20, 2007

SO ORDERED

PAUL A. CROTTY
United States District Judge